No. 24-1461

# In the
# United States Court of Appeals
## For the Tenth Circuit

BROOKE SLUSSER, *et al.*,

*Plaintiffs – Appellees,*

v.

THE MOUNTAIN WEST CONFERENCE, *et al.*,

*Defendants – Appellants*

Appeal from the United States District Court
for the District of Colorado, No. 1:24-cv-03155-SKC-MDB
The Honorable **S. Kato Crews**, Judge Presiding

## EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

WILLIAM BOCK III
KROGER GARDIS & REGAS, LLP
111 MONUMENT CIRCLE, SUITE 900
INDIANAPOLIS, IN 46204
TEL: (317) 692-9000

*Counsel for Plaintiffs – Appellees*

## <u>TABLE OF CONTENTS</u>

A.    The TEP Affords Men Performance Enhancing Benefits ..............................3

B.    Fleming's Participation in Women's Volleyball Matches Increases Safety
        Risk ..........................................................................................................4

C.    The TPP and TEP Will Undermine Women's Rights in the MWC
        Tournament and, Should SJSU Qualify, in the NCAA National
        Championship ..........................................................................................5

A.    Jurisdictional Statement...............................................................................7

B.    Standard of Review......................................................................................8

C.    Appellants Will Be Irreparably Harmed Without an Injunction ....................8

D.    Appellants are Likely to Succeed on the Merits of Their Appeal ................10

        1.    The MWC is a state actor ...................................................................10

        2.    MWC members have ceded control to the MWC over relevant aspects
              of their collegiate sports programs ....................................................12

        3.    The TEP violates Title IX ...................................................................14

        4.    The TPP and TEP violate Equal Protection .......................................17

        5.    The TPP violates the First Amendment ..............................................17

E.    Opposing Parties Will Not be Harmed by an Injunction..............................20

F.    An Injunction Will Not Harm the Public Interest ........................................21

G.    A Heightened Standard Should Not Apply to Plaintiffs' Request for an
        Injunction ..................................................................................................21

H.    Plaintiffs Purported Delay Does Not Prevent Injunctive Relief ..................23

# INTRODUCTION

Competitive fairness, athlete safety and/or the encouragement of academic rigor is the rationale for every Mountain West Conference ("MWC") rule involving student-athlete eligibility or the cancellation of games *except for* the MWC's internal" Transgender Participation Policy ("TPP")[1] which (1) incorporates the transgender eligibility policies of the National College Athletic Association ("NCAA") (the "TEP")[2] into the MWC Handbook, (2) uses a "don't ask, don't tell" provision to hide behind a veil of secrecy information about men[3] participating on women's teams, and (3) targets for punishment schools that try to protect the safety of women student-athletes or protest men competing in women's sports. These issues with the TPP and TEP came to the forefront in the MWC this year as the San Jose State University women's volleyball team (the "SJSU Team") rostered and started a trans-identifying male outside hitter named Blaire Fleming.

The incongruity of the TPP with the rest of the MWC Handbook may be why the MWC hid it from the public until September 27, 2024, when, without even an announcement, MWC staff inserted the TPP into the online MWC Handbook.

---

[1] The TPP is filed in the district court docket, Dkt.1-1 at 113 of 132.

[2] The TEP is Dkt.1-3.

[3] References to "sex" "man" woman' "male" and "female" herein refer to one's immutable "biological sex" and not one's "gender identity." *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("sex" "refer[s] only to biological distinctions between male and female").

Plaintiffs were injured by the TPP and TEP which authorized a man to compete in MWC women's volleyball, assigned wins to the SJSU Team and losses to Plaintiffs' teams for games canceled due to safety, and resulted in the SJSU Team being seeded second and Plaintiffs' teams receiving lower seeds in the single elimination conference tournament, from which the winner receives an automatic bid to the NCAA Championship. Plaintiffs sued because these polices violate (1) Title IX's mandate of equal opportunity for women in collegiate athletics, (2) the Equal Protection Clause, as they classify based on sex without adequate justification, and (3) constitute unconstitutional viewpoint discrimination, penalizing the expressive activity of boycotts and accompanying speech.

Plaintiffs demonstrated a clear and unequivocal right to relief, but the district court abused its discretion by failing to issue a preliminary injunction. Specifically, the district court erroneously (1) held that Title IX protects men who identify as transgender more than biological women, (2) ignored Plaintiffs' facial First Amendment challenge to the TPP, and (3) held that Plaintiffs have already suffered injury so they cannot seek to enjoin further injury that will occur at the MWC women's volleyball tournament.

An injunction pending appeal would reorder the conference standings, award a first-round bye in the tournament to the Utah State University ("USU") Team

rather than the SJSU Team, and render Fleming ineligible for the conference tournament.

## BACKGROUND

### A.    The TEP Affords Men Performance Enhancing Benefits

Testosterone is performance enhancing.[4] Every man naturally produces far more testosterone than every woman. There is a significant gap between the upper end of the testosterone range for women and the lower end of the testosterone range for men. The lower end of the male range is four-to-five-fold higher than the upper end of the female range (males 7.7–29.4 nmol/L, females 0.1–1.7 nmol/L). Dkt.14-1 at 359–380, Dr. Lundberg Declaration ("Lundberg-Decl.") ¶4.2. Thus, the <10 nmol/L testosterone suppression threshold in the TEP for granting eligibility to men to compete in Women's Volleyball is far higher than any female volleyball athlete could ever achieve without doping. Dkt.14-1 at 467–503, Dr. Carlson Declaration ("Carlson-Decl.") ¶126.

For men who wish to compete in women's college sports and are undergoing so-called gender affirming hormone treatment ("GAHT") (i.e., the suppression of

---

[4]    *See*  https://www.ncaa.org/sports/2024/7/8/faqs-about-ncaa-banned-substances-and-medical-exceptions-procedures.aspx#:~:text=Due%20to%20the%20performance%2Denhancing,NCAA%20athletic%20participation%20is%20banned ("Due to the performance-enhancing properties (e.g., increased strength and power, shortened recovery time) of this class of drugs, use of any anabolic agent including testosterone and other anabolic steroids in NCAA athletic participation is banned."). *See also* TEP, Dkt.1-3 at 2, 4, 6–20 of 152.

testosterone levels) the TEP athletically advantages these men by not requiring them to suppress their testosterone down to female levels.

Athletic advantages possessed by males as a class can only be minimally reduced through testosterone suppression. Lundberg-Decl. ¶¶6.12, 8.4. Peer-reviewed research demonstrates that testosterone suppression does not eliminate male performance advantages, leaving what even after suppression may be referred to as retained male advantage ("RMA"). Lundberg-Decl. ¶¶6.1–6.11 ("retention of athletic advantage despite testosterone suppression").

The advantage in circulating testosterone that the MWC's policies give to men competing in women's sports is additive to the advantage that men bring into women's sport as the result of the biological advantage of male physiology. *Id*.

## B.    Fleming's Participation in Women's Volleyball Matches Increases Safety Risk

Fleming has leaping ability and hitting power that far exceeds any female player in the conference. Dkt.14-1, 420-428, Declaration of Batie-Smoose ("Batie-Smoose-Decl.") ¶¶26-28; Dkt.14-1, 454–461, Declaration of Slusser ("Slusser-Decl.") ¶12; Dkt.14-1, 434–449, Declaration of Ray ("Ray-Decl.") ¶¶17–18, 23. Fleming has hit multiple women in the body and face with spikes because those players are unable to react to the speed of Fleming's spikes. Slusser-Decl. ¶¶19, 31, 34; Batie-Smoose-Decl. ¶¶30, 40–41; Ray-Decl. ¶18.

"[P]articipation in girls' or women's volleyball by biologically male individuals will increase concussion injury risk for participating girls or women." Carlson-Decl. ¶142. In volleyball, scientific research demonstrates that a "volleyball … struck by a male and travelling an average 35% faster than one struck by a female, will deliver 82% more energy to a head upon impact." *Id.* ¶¶134, 142.

## C.    The TPP and TEP Will Undermine Women's Rights in the MWC Tournament and, Should SJSU Qualify, in the NCAA National Championship

Merely because the SJSU team rosters a "transgender student-athlete" the TPP assigned teams refusing to play SJSU a loss and awarded SJSU a win. This held true even though the teams boycotted due to safety concerns and despite every other forfeit rule in the MWC allowing the MWC office to consider athlete safety as a justification for not imposing a win or loss for a canceled game.

During the 2024 MWC season SJSU was awarded six wins by forfeit and four MWC teams were assigned either one or two losses for refusing to play SJSU. This chart reflects the MWC final standings and impact of the forfeiture provision upon seeding for the MWC tournament.

| Current Seed/Rank (11/23/2024) | Team | Record w/ TPP | Record w/out TPP | Seed/Rank w/out TPP (win %) |
|---|---|---|---|---|
| 1 (.765) | CSU | 14-4 | 14-4 | 1 (.765) |
| 2 (.667) | SJSU | 12-6 | 6-6 remove 6 wins | 6 (.500) |
| 3 (.667) | Utah State ("USU") | 12-6 | 12-5 remove 1 loss | 2 (.705) |
| 4 (.667) | Fresno State | 12-6 | 12-6 | 3 (.667) |

| Current Seed/Rank (11/23/2024) | Team | Record w/ TPP | Record w/out TPP | Seed/Rank w/out TPP (win %) |
|---|---|---|---|---|
| 5 (.611) | S.D. State | 11-7 | 11-7 | 5 (.611) |
| 6 (.500) | Boise State ("BSU") | 10-8 | 10-6 remove 2 losses | 4 (.625) |
| 7 (.444) | UNLV | 8-10 | 8-10 | 7 (.444) |
| 8 (.389) | Wyoming | 7-11 | 7-9 remove 2 losses | 8 (.438) |
| 9 (.333) | New Mexico | 6-12 | 6-10 | 10 (.333) |
| 10 (.278) | Nevada, Reno | 5-13 | 5-12 remove 1 loss | 9 (.294) |
| 11 (.111) | Air Force | 2-16 | 2-16 | 11 (.111) |

Just six teams play five single elimination games in the MWC tournament. The top two seeds receive a first-round bye. Absent the TPP forfeiture provision SJSU would be reduced from the second to the sixth seed and USU would be the second seed and receive a first-round bye. BSU would move from sixth to the fourth seed and instead of playing the three seed in its first-round game would play the fifth seed—San Diego State, a team which BSU beat earlier this season.

## RELIEF REQUESTED

As the TPP and TEP violate Title IX and Equal Protection and target the right-to-boycott protected by the First Amendment, Appellants[5] ask this Court to enjoin enforcement of both and enjoin the MWC from permitting any male from competing

---

[5] Appellants are Kaylie Ray (USU), Katelyn and Kiersten Van Kirk (BSU), and Brooke Slusser (SJSU).

in the MWC women's volleyball tournament which commences on Wednesday, November 27, 2024, at 6:00 p.m. Mountain Time.

Appellants have contacted Appellees who do not consent to the relief requested. Intervenor-Plaintiff Utah State University has no objection.

**APPELLANTS HAVE NOT SOUGHT AN INJUNCTION
PENDING APPEAL FROM THE DISTRICT COURT**

The preliminary injunction hearing concluded November 21, 2024, at noon and the order appealed from issued November 25, 2024. Dkt.37. Due to limited time before the MWC tournament, seeking relief from the district court is impractical. The Tenth Circuit has previously "excused this requirement where another application to the district court would serve little purpose." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001) (excusing application to district court), *see also McClendon v. City of Albuquerque*, 79 F.3d 1014, 1020 (10th Cir. 1996) (same).

**ARGUMENT**

The district court refused to grant injunctive relief based on three factors "irreparable harm, . . . likelihood of success on the merits, [and] the balance of harms." Dkt.37 at 27.

**A.    Jurisdictional Statement**

The district court had subject matter jurisdiction over Appellants' First and Fourteenth Amendment and Title IX claims via 28 U.S.C. §§ 1331 and 1343.

7

This Court has subject matter jurisdiction over this appeal arising from the district court's denial of Appellants' Motion for Preliminary Injunction via 28 U.S.C. § 1292(a)(1).

## B.    Standard of Review

On a request for an injunction pending appeal, "this court makes the same inquiry as it would when reviewing a district court's grant or denial of a preliminary injunction [and] consider[s], based on a preliminary record, whether the district court abused its discretion and whether the movant has demonstrated a clear and unequivocal right to relief." *Homans*, 264 F.3d at 1243.

## C.    Appellants Will Be Irreparably Harmed Without an Injunction

The primary reason the district court said it denied injunctive relief is lack of irreparable harm. However, the court did not find Plaintiffs' injuries could be compensated through money. Nor did the court find a heightened risk of physical injury or lost athletic opportunity is not irreparable harm. Rather, the court found harm lacking due to: (1) "delay in seeking [injunctive] relief," Dkt.37 at 15, and (2) "most (if not all) of the alleged harm has already occurred" because Fleming "has played on the team since 2022" and "each team incurred the loss on its record." Dkt.37 at 19.

But no Appellant has yet competed against Fleming this year. That is, they have not had to face a male athlete who may compete with testosterone levels that

are five times higher than what any woman can have without doping and can spike a ball with "82% more energy to a head upon impact." Carlson-Decl.¶¶134, 142. The district court fundamentally misconstrued the nature of the relief requested – which is not only to redress the misawarded wins and losses but to address the irreparable harm of Plaintiffs putting their bodies at risk of injury in the upcoming conference tournament.

The careers of NCAA student-athletes are short and culminate years of hard work focused upon becoming a collegiate athlete. An opportunity to compete in a conference championship or qualify for a NCAA national championship, if lost, may never occur again.

"[A] plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1210 (10th Cir. 2009). "[A]ny deprivation of any constitutional right" is irreparable harm. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019). Plaintiffs' claims satisfy the "certain, great, actual and not theoretical standard" of irreparable harm.

The court did not contend Plaintiffs sat on their rights during the short period in which they engaged in protesting the policy publicly and internally at their schools before suing, but rather suggested Plaintiffs are somehow accountable for their

schools' acquiescence in an "internal" policy they knew nothing about. Dkt.37 at 16-17. Yet, this finding entirely undercuts Title IX's implied private right of action that belongs to Plaintiffs and not their schools.

**D.    Appellants are Likely to Succeed on the Merits of Their Appeal**

**1.    The MWC is a state actor**

Athletic conferences and associations – like MWC – are state actors when they are pervasively entwined in a symbiotic relationship with public schools. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001). Symbiosis occurs when the state entity has "'so far insinuated itself into a position of interdependence' with a private party that 'it must be recognized as a joint participant in the challenged activity.'" *Johnson v. Rodrigues*, 293 F.3d 1196, 1204 (10th Cir. 2002) (quoting *Gallagher*, 49 F.3d at 1451))

The Supreme Court in *Brentwood* found pervasive entwinement because the athletic association in that case was comprised of "members" who are "public schools," scholastic athletics "play an integral part in the public education of" the state institutions, and the member schools "adopt and enforce the rules that make the system work." *Brentwood Acad.*, 531 U.S. at 299. *See also Wittner v. Banner Health*, 720 F.3d 770, 778 (10th Cir. 2013); *Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1026, 1030–31 (10th Cir. 2007) ("98

percent of its members were public schools" and "all fourteen of OSSAA's current directors are public school employees").

The undisputed evidence showed that state public universities are entwined with the MWC. State public university presidents comprise the Board of Directors that establishes the policies of the MWC, Dkt.27-1 at 2–14, Declaration of Gilliland ("Gilliland-Decl.") ¶1; Dkt.27-1 at 68–84, Bylaws §§ 2.03, 2.16, and the athletic directors of these same state universities ratify those decisions. Gilliland Decl.¶ 13. Moreover, MWC sub-governance committees –also made up of officials from state public universities – play critical roles in recommending and implementing MWC rules. Gilliland-Decl.¶11; Dkt.1-1,[6] Handbook Rule 1.3.

The MWC worked through this governance structure when adopting the TPP. The TPP was passed by Board vote in which all eleven votes were cast by presidents of state public universities, Dkt.27-1 at 202 (Aug. 23, 2022 Meeting), and it was ratified by eleven athletic directors from the same universities, *id.* at 206 (Aug. 25, 2022 Meeting). This is paradigmatic entwinement under *Brentwood*.

MWC arguments to the contrary are not persuasive. They cite to *NCAA v. Tarkanian*, 488 U.S. 179, 193 (1988), which held the NCAA was not a state actor merely because its member institutions implemented and enforced NCAA rules that

---

[6] The MWC Handbook ("Handbook"), Dkt.1-1, contains all MWC rules and regulations referenced herein other than the TEP.

were not developed by state actors. Here, by contrast, state public university presidents on the MWC Board set the policies of the MWC, which the MWC then enforces against its member institutions.

Second, the MWC argued that precedents finding that athletic associations are state actors found pervasive entwinement between the association and only a single state, not multiple states. Dkt.27 at 30–31. But entwinement with multiple state actors instead of only one does not weaken the argument for finding the MWC a state actor. Rather, it strengthens it. The state actors here are known and definite – they are eleven state public schools across nine states.

### 2. MWC members cede control over relevant aspects of their collegiate sports programs to the MWC

Title IX applies to "any education program or activity" that "receives federal financial assistance." 20 U.S.C. § 1681. Title IX's "inclusive terminology" "encompass[es] *all* forms of federal aid to education, direct or indirect." *Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984) (cleaned up) (emphasis in original). Recognizing the "need to accord Title IX a sweep as broad as its language," the Court is "reluctant to read into [Title IX] a limitation not apparent on its face." *Id. Accord Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 460 (1999).

The MWC is subject to Title IX because it exercises "controlling authority" over its federally funded member institutions in the realm of collegiate athletics. The Fourth, Sixth, and Eleventh Circuits have held that Title IX applies to athletic

12

associations that exercise "controlling authority" over federal funding recipients. *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1294 (11th Cir. 2007).[7]

Here, the MWC did not dispute that all of its member universities are federally funded. These federally funded MWC members – including all eleven members that participate in women's volleyball – ceded "controlling authority" to the MWC through their university presidents establishing MWC policy on the MWC board of directors. The analysis under the prior section's state action analysis applies with equal force in establishing the "controlling authority" test.

Many courts have already found that covered institutions cannot avoid their Title IX obligations merely by forming an athletic association and delegating authority to that association to side-step Title IX. *E.g.*, *id*. As the District Court for the Western District of Michigan stated

> Such a scheme would not only encourage "recipients" of federal funds to transfer control over those funds to others (because both parties could thereby avoid Title IX liability), it would allow federal funds to promote gender discrimination so long as the recipients of those funds empowered someone else to promulgate the discriminatory policies.

---

[7] *See also B.P.J. by Jackson v. W. Virginia State Bd. Of Educ.*, 98 F.4th 542, 554 (4th Cir. 2024); *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994); *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1230 (N.D. Ala. 2010) (applying *Williams*); *A. B. by C.B. v. Hawaii State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357–58 (D. Haw. 2019) (applying *Williams* and *Horner*).

*Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 734 (W.D. Mich. 2000). This is exactly what the members of the MWC have done here. They have formed an association run by the Presidents of covered institutions, yet claim that Title IX does not apply to the MWC.

Moreover, the MWC's policies define the parameters of how every member institution competes in intraconference competition, which effectively controls significant aspects of the member institutions' athletic programs. These policies include, but are not limited to rules for how "conference competition shall be conducted," Handbook Reg. 16.1, *see also* Handbook Reg. 1.1.1, Bylaws § 1.01(c), end-of-season conference tournaments, Handbook Reg. 16.4; *see also, e.g.*, Handbook Reg. 4.4, the number of non-conference games that women's volleyball teams may schedule, Handbook Reg. 16.9, [and] the right to negotiate media contracts. Handbook Rule 9; Dkt.14-1 at 134–36 (Memorandum of Understanding). MWC control is enforced by charging association fees, Bylaws § 1.02, and steep exit fees to any member that tries to leave the MWC to join another conference. Bylaws 1.04(b); Dkt.14-1, 134–36.

### 3.    The TEP violates Title IX

Title IX equalizes opportunities for women by extending its protections based on "sex." 20 U.S.C. § 1681(a). "Students are not only protected from discrimination, but also specifically shielded from being 'excluded from participation in' or 'denied

the benefits of ' any 'education program or activity.'" *Davis v. Monroe Cnty. Bd. for Ed.*, 526 U.S. 629, 650 (1999) (quoting 20 U.S.C. § 1681(a)). That may be any act "that unintentionally results in exclusion," *Knox Cnty. v. M.Q.*, 62 F.4th 978, 1002 (6th Cir. 2023), or precludes "meaningful access" to a desired benefit. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

As used in Title IX "sex" means biological sex. *Kansas v. United States Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *8 (D. Kan. July 2, 2024); *see also Bostock*, 590 U.S. at 655 ("'Sex' means the physiological or 'biological distinctions between male and female.'"). Recently, all nine Justices refused to stay a lower court ruling enjoining new Title IX regulations that "newly redefine[d] sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2509–10 (Aug. 16, 2024). Thus, the Supreme Court agrees with the Eleventh Circuit that sex discrimination under Title IX is differential treatment of biological females in comparison to biological males–full stop. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 813–14 (11th Cir. 2022) ("There simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons under Title IX.").

The district court clearly erred in holding that Title IX protects men who identify as transgender just as much if not more than biological women. The Tenth Circuit expressly "decline[d] to decide whether transgender status is a quasi-suspect

class." *Fowler v. Stitt*, 104 F.4th 770, 794 (10th Cir. 2024), and it recognized the need to balance transgender rights against the rights of biological women if the two conflict. *Id.* at 793 ("physical differences between men and women … exist and … may be relevant to whether state action passes judicial scrutiny."). The district court ignored this precedent.

Moreover, no Court in the Tenth Circuit has addressed a situation where trans rights directly conflict with the rights of women. In this circumstance, the district court's conclusion that "Title IX's prohibitions include[] discrimination based on an individual's trans status or sexual orientation" means nothing because it does not address whether Title IX protects biological women from having to compete against men who (1) may have five times the testosterone as women, Carlson-Decl.¶126, and (2) increase the risk of serious injury arising from the capacity to strike the ball with 82% more impact.

Title IX is clear. It forbids treating women worse than men. *See* 117 Cong. Rec. 30,407 (1971) (statement of Sen. Bayh) (noting Title IX would not require co-ed sports teams or locker rooms); 118 Cong. Rec. 5807 (1972) (statement of Sen. Bayh) (Title IX respects privacy in athletic facilities). Sex distinctions are allowed; otherwise, Title IX cannot achieve its goal to stop denials of "benefits" in educational programs "on the basis of sex." 20 U.S.C. § 1681(a). *Cf. Fischer v. U.S.*, 603

U.S. 480, 490 (2024) (looking to the "distinct purpose of each provision" to discern meaning based on their "evident purpose") (cleaned up).

Title IX not only *permits* sex-based distinctions but *requires* them where necessary to ensure equal opportunity. *Soule v. Connecticut Ass'n of Sch.*, No. 3:20-CV-00201(RNC), 2024 WL 4680533, at *11 (D. Conn. Nov. 5, 2024) (holding "failure to provide [women athletes] with sex-separated competition" stated a Title IX claim).

### 4. The TPP and TEP violate Equal Protection

The TPP classifies based on sex, its forfeiture provisions apply if a competitor on the other team is a "transgender student-athlete" (i.e., has a natal sex different from the sex category in which they are competing). Likewise, the TEP classifies based on sex. Thus, under Equal Protection and Tenth Circuit law both the TPP and TEP must be analyzed employing heightened scrutiny. *Fowler v. Stitt*, 104 F.4th 770, 794 (10th Cir. 2024). A sex-based classification is lawful only if it serves an important interest and is substantially related to achievement of that interest. *Id.* Neither the TPP or TEP survive heightened scrutiny because the MWC has not identified any interest sufficient to outweigh a woman's interests in safe and fair competition.

### 5. The TPP violates the First Amendment

The First Amendment protects participation in boycotts. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982); *Koontz v. Watson*, 283 F. Supp. 3d 1007,

1021 (D. Kan. 2018).  The TPP is unique among MWC rules by punishing expressive activity, namely boycotts and protests of women's rights in sports, with a forfeit and a loss for the protesting team and a win for the team rostering a "transgender student-athlete." The contrast to other MWC rules regarding canceled contests and forfeits is stark. The MWC Handbook contains two rules addressing failure to complete a scheduled game: Interrupted Contest Procedures (Regulation 1.7) and Inclement Weather procedures (Regulation 1.8). Neither calls for imposing a forfeit where a contest is not played due to concerns about student-athlete safety.

Interrupted Contest Procedures apply in "emergencies . . . which make a contest's start or completion impossible or inadvisable," Handbook Reg. 1.7, and can also be applied "when circumstances exist such that commencement or continuation of play would pose a threat to the safety of the constituent groups involved with the contest." Handbook Reg. 1.7.2. "The authority to cancel, postpone or terminate a contest is vested only in the Commissioner or her designee. Authority to suspend a contest is vested in the head official." Handbook Reg. 1.7.3. "If a contest is suspended prior to the start for any reason and cannot resume under the applicable guidelines, the participating institutions, in consultation with the Commissioner or their designee, shall attempt to declare the contest postponed and reschedule the contest at a later date. If the Commissioner determines the game cannot be rescheduled,

18

it will be considered a cancelled game." Handbook Reg. 1.7.4.4 (emphasis added). No forfeit is declared.

The TPP is also nothing like other MWC rules involving forfeits. MWC Handbook General Regulation 1.12 states that, "[a]t no time is either the home or visiting coach vested with the authority to stop or discontinue play. A coach unilaterally taking his/her team from the playing area or refusing to play may be subject to Conference sanctions and possible forfeiture of the contest." Handbook Reg. 1.12. Additionally, rules pertaining to Men's and Women's Basketball, and Football provide that a visiting team which does not arrive at the location of the contest by the scheduled start time is subject to forfeit of the contest upon approval of the Conference office. *See* Handbook Regs. 3.8.a (Men's Basketball), 4.8.a (Women's Basketball), 6.4.a (Football). These were the only MWC rules addressing forfeits before promulgation of the TPP and they require specific evaluation by the Conference office of the reasons a contest was not played, including consideration of extenuating concerns such as safety. The TPP is therefore *the only MWC rule that imposes an automatic penalty for a team not playing a match or game due to concerns about athlete safety*.

"Viewpoint discrimination is a subset—and a particularly 'egregious form'— of content discrimination." *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013). It occurs "'[w]hen the government targets not subject matter, but particular views

19

taken by speakers on a subject.'" *Id.* Viewpoint discrimination is "presumptively invalid." *Id.*

Regardless of when it was adopted, the TPP was adopted specifically to punish dissent from full-on endorsement of transgender ideology and without room to even consider the safety of female student-athletes. The MWC is well aware that men playing on sex-separated women's teams is a controversial matter of public debate and that is why the TPP was adopted–to impose the MWC's viewpoint on all participants in MWC sports, including on all public universities in the conference, by penalizing only those who engage in the expressive activity of a boycott and only when there is a "transgender student-athlete" on the other team. The TPP constitutes classic viewpoint discrimination.

The district court ignored all of this analysis by noting that the TPP was adopted in 2022. Dkt.37 at 26. This fundamentally ignores the Appellants' facial First Amendment challenge that does not hinge upon when the TPP was adopted. The TPP singles out expressive content on its face and punishes it.

**E.      Opposing Parties Will Not be Harmed by an Injunction**

When a constitutional right "hangs in the balance" "'even a temporary loss' usually trumps any harm to the defendant." *Fort Collins*, 916 F.3d at 806. Here, Plaintiffs' Title IX and constitutional rights and safety all hang in the balance.

Moreover, it is possible for transgender athletes to compete in the sex category matching their sex. The National Association of Intercollegiate Athletics (NAIA) has crafted a transgender eligibility policy that does just that. As Dr. Brent Ellis explained, the NAIA requires trans-identifying male athletes to participate in the sex category matching their biological sex.[8]

## F.    An Injunction Will Not Harm the Public Interest

The Tenth Circuit recognizes "it's always in the public interest to prevent the violation of a party's constitutional rights." *Fort Collins*, 916 F.3d at 807. This factor also favors Plaintiffs. The district court relied instead upon the administrative burden imposed by the MWC of having to change plans at the last minute. But these administrative inconveniences pale in comparison to the tangible safety risks identified by the Appellants, not to mention their constitutional rights.

## G.    A Heightened Standard Should Not Apply to Plaintiffs' Request for an Injunction

The district court should not have applied a "heightened standard" to Plaintiffs' motion for injunctive relief, but even if a heightened standard applies, injunctive relief is appropriate. The TPP and TEP conflict with Title IX, Equal Protection and the First Amendment. There exists no legitimate reliance interest in having unlawful policies applied in the tournament.

---

[8] Ellis Declaration, Doc. 14-1 at 381–391.

Plaintiffs seek a reordering of conference standings improperly calculated due to unlawful application of the TPP. This relief will not remove any team from the conference tournament. It will merely alter the impact on the standings of games *which were never played* and therefore as to which no team can claim true reliance.

As Plaintiffs have demonstrated a substantial likelihood of success on the merits it is appropriate to find that the interests of the five teams (other than SJSU) in safety and fair competition outweigh any interest of SJSU in playing with an ineligible player. In these respects, this case is analogous to *Homans*, 264 F.3d at 1242, where this Court enjoined campaign contribution and expenditure limits, altering the status quo, but ensuring that the upcoming election would be fairer and more untainted by the unconstitutional rules adopted by the City. Permitting SJSU to compete with Fleming would give the SJSU Team an inequitable competitive advantage and put the safety of players on other teams at greater risk.

This Court should return the parties to the status quo before the MWC's unlawful policies were adopted. As the Fifth Circuit pointed out, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, [including] by returning to the last uncontested status quo between the parties." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

## H.    Plaintiffs Purported Delay Does Not Prevent Injunctive Relief

The student-athletes did not unduly delay bringing their challenge. The Appellants filed this lawsuit 48 days after the TPP was made public. They cannot be blamed for giving the MWC the benefit of the doubt that they would do the right thing in response to their protests.

The MWC has also not demonstrated prejudice arising from when this lawsuit was brought. The district court ruled on an undisputed factual record without an evidentiary hearing. Therefore, the MWC cannot point to the admission of any evidence that prejudiced their defense.

Plaintiffs acted appropriately by publicly protesting to bring attention to their concerns through a series of lawful boycotts. Only when the MWC ignored them did Plaintiffs bring a lawsuit, and they did so expeditiously with sufficient time for their claims to be considered in advance of the MWC tournament.

## CONCLUSION

For these reasons, Plaintiffs are entitled to an injunction pending appeal.

Respectfully submitted,

*/s/ William Bock III*
William Bock III, Atty. No. 14777-49
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail: wbock@kgrlaw.com

*ATTORNEYS FOR PLAINTIFFS –*
*APPELLEES*

November 25, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,198 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ William Bock III*
William Bock III, Atty. No. 14777-49
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail: wbock@kgrlaw.com

*ATTORNEYS FOR PLAINTIFFS –*
*APPELLEES*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2024, I electronically filed the forego-

ing *Emergency Motion for Injunction Pending Appeal* with the Clerk of the Court

for the United States Court of Appeals for the Tenth Circuit by using the appellate

CM/ECF system. Participants in the case are registered CM/ECF users, and service

will be accomplished by the appellate CM/ECF system.

/s/ William Bock III
William Bock III

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000

## Local Rule 8.2(A) Certificate

Appellants provide the following information pursuant to Local Rule 8.2(A)

1.    The district court's order denying the motion for preliminary injunction

        was entered on November 25, 2024.

2.    This motion was filed on the same day as the decision of the district

        court.

3.    The district court's order was effective immediately.

The contact information for the counsel of record for all parties is as follows:

Bryan Heckenlively
Helen E. White
Jennifer L. Bryant
Munger Tolles & Olson, LLP
bryan.heckenlively@mto.com
(415) 512-4015
helen.white@mto.com
(202) 220-1136
Jennifer.Bryant@mto.com
(213) 683-9293

*Counsel for Board of Trustees of the California University System, Laura Alexander, Todd Kress, and Michelle McDonald Smith*

Andrew Nussbaum
First & Fourteenth PLLC
andrew@first-fourteenth.com
(719) 428-2386

*Counsel for Intervenor-Plaintiff Utah State University*

Kyler K. Burgi
Chad D. Williams
David Graham & Stubbs, LLP
kyler.burgi@davisgraham.com
(303) 892-7223
chad.williams@davisgraham.com
(303) 892-7474

Wesley R. Powell
Matt D. Basil
Willkie Farr & Gallagher, LLP
wpowell@willkie.com
(212) 728-8264
mbasil@willkie.com

*Counsel for The Mountain West Conference and Gloria Nevarez*

/s/ William Bock III
William Bock III

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000